1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| VANCE HAWK and KEALY HAWK, husband and wife, | NO. |
| Plaintiffs, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| vs. | |
| ROSS HUNTER, in his official capacity as Secretary of Washington State Department of Children, Youth and Family Services, | |
| Defendant. | |

Plaintiffs Vance and Kealy Hawk, for their causes of action against Defendant, state as follows:

## I. <u>INTRODUCTION</u>

1.     Vance and Kealy Hawk are residents of the State of Washington who wish to become foster parents so that they can adopt a child.

2.     As part of the process to secure a foster parent license overseen by the Washington State Department of Children, Youth and Families, headed by

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
CASE NO.

Page 1

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

Defendant Ross Hunter (collectively, the Department), the Department conducted a home study of the Hawks.

3.     The Hawks completed the application process and proved qualified to be foster parents in every respect except one.

4.     During the home study, the Department's home study worker questioned the Hawks about their views regarding lesbian, gay, bisexual, transgender, or questioning (LGBTQ+) youth.

5.     The Hawks responded that they would love and support any child placed in their care, but – consistent with their sincerely-held religious beliefs – they could not affirm now that if the issue should arise sometime in the future they would agree to support the child in undergoing medical treatments to transition to the opposite sex or related counseling, or to call a LGBTQ+ youth by a name other than his/her legal name, or use pronouns that are inconsistent with the child's birth sex.

6.     The Department told the Hawks that their foster parent applications would be denied unless they were willing to take a Department-sponsored class "and make some changes in your attitudes." When the Hawks declined, the Department denied the Hawks' foster parent application based on their "inability to be supportive of an LGBTQ youth and accepting their values, beliefs and how

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
CASE NO.

Page 2

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

they choose to present themselves."  The Department also noted that the Hawks were "unwilling to accept new learning or training around this issue."

7.      The Department's actions are subject to strict scrutiny under federal law, and because the Department has other ways to pursue its alleged interests without completely barring the Hawks from serving as foster parents, the Department's actions cannot survive that inquiry.

8.      The Hawks thus seek a declaratory judgment that the Department violated their rights under the Free Exercise and Free Speech Clauses of the First Amendment, and an injunction preventing the Department from further violating their rights.

9.      This action arises under the provisions of the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

## II. <u>THE PARTIES</u>

10.      Vance Hawk resides and is domiciled in the State of Washington. He is a faithful and observant Evangelical Christian. He has been married to Kealy Hawk since 2014.  He is a graduate of the United States Air Force Academy and is a Captain in the United States Air Force.

11.      Kealy Hawk resides and is domiciled in the State of Washington. She is a faithful and observant Evangelical Christian.  She is a Registered Nurse.  The Hawks have two biological children together.

12.     Defendant Ross Hunter is Secretary of the Washington State Department of Children, Youth, and Families. The Department administers a foster licensing and placement program pursuant to Washington state law. As Secretary, Defendant Hunter is responsible for administering that program, as well as ensuring that the Department meets its obligations to license foster parents and provide for the care, protection and development of children in state custody. At all times material to this lawsuit, Defendant Hunter acted within the course and scope of his duties as a public employee, was a state actor, and acted under color of state law.

### III. JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a).

14.     This Court has personal jurisdiction over Defendant.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b).

### IV. GENERAL ALLEGATIONS

**The Hawks and their Religious Beliefs**

16.     The Hawks are Evangelical Christians.

17.     The Christian faith places a strong emphasis on family life.

18.     The Hawks believe that the Scriptures are the supreme standard by which all human conduct and opinions should be derived and followed.  As with all facets of daily existence, the Hawks seek guidance from God through Scripture to determine what is in their best interest and to live according to His will.  (2 Peter 1:19-21; Matthew 24:35.)

19.     As followers of Jesus, the Hawks strive to treat all people with dignity and respect. The Bible commands followers of Christ to love everyone. Created in the image of God, they must be treated with dignity and respect. This includes people of all sexual orientations and gender identities. The Bible commands "You shall love your neighbor as yourself" (Mark 12:31).

20.     The Hawks believe in the Genesis account of creation, and that God has provided a bodily structure unique to the man and woman created in God's image.  The Hawks also believe that purposefully seeking to alter one's sex through chemical or surgical means or to live as the opposite sex is harmful to a person and violates God's design.

21.     Nonetheless, the Hawks believe that every child deserves love, support, and compassion, regardless of their sexual orientation or gender identity, and they would love and support an LGBTQ+ child as they would any child in their care.

COMPLAINT FOR DECLARATORY AND        Page 5
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

### **The Hawks' Desire to Become Licensed Foster Parents**

22.    While Vance Hawk was stationed with the Air Force in Las Vegas, Nevada, Vance and Kealy became involved in their church's Safe Families for Children Ministry.  That program surrounds families in crisis with a caring, compassionate community and is designed to keep children safe and families intact.

23.    The Hawks felt a religious calling to assist and to serve children in need, and working with their church's ministry, they cared for younger children in their home for short periods of time.

24.    Based on that experience, the Hawks first developed an interest in possibly adopting a child.

25.    Their initial inclination was to adopt a younger child.  However, when they learned how many teenagers are in the foster care system, they realized that older children also were in dire need of loving and caring homes and decided to adopt a teenager.

26.    While in Nevada, Vance and Kealy Hawk obtained an approved home study and the State of Nevada approved them to serve as an adoptive family.

27.    The Hawks had a genuine interest in adopting a 14-year old boy while they were in Nevada.  However, because Vance Hawk was scheduled to be transferred to Washington in the coming months and the teenager had biological

COMPLAINT FOR DECLARATORY AND          Page 6
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

family in Nevada, the state determined that the Hawks would not be a good placement for the teen.

## The Department's Licensing Requirements for Foster Homes

28.     In Washington the licensing requirements for foster homes are governed by Chapter 110-148 of the Washington Administrative Code. The Code states that these requirements are "designed to ensure children who are in foster care are safe, healthy and protected from all forms of child abuse and neglect." WAC 110-148-1300.

29.     An applicant must (a) be at least 21 years of age; (b) have sufficient income to support the applicant without relying on foster care payments; (c) complete training in First Aid/CPR, HIV/AIDs, and blood borne pathogens; (d) submit a negative tuberculosis test dated within the last year; and (e) have current pertussis and influenza immunizations. WAC 110-148-1320; 110-148-1365; 110-148-1375.

30.     In addition, the applicant and all adult household members must pass a background clearance check with the FBI and Washington State Patrol. WAC 110- 148-1320.

31.     Before granting a foster care license, the Department also assesses both the applicant's "ability to provide a safe home and to provide the quality of

COMPLAINT FOR DECLARATORY AND          Page 7
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

care needed by children placed in the home," as well as whether the applicant meets the Department's training requirements. WAC 110-148-1320.

32.     An applicant is required to demonstrate "[t]he understanding, ability, physical health, emotional stability, and personality suited to meet the physical, mental, emotional, cultural and social needs of children under their care," and that they have "functional literacy," are "able to communicate with the child, the department, health care providers, and other service providers," and will "not use drugs or alcohol . . . in a manner that affects [their] ability to provide safe care to children." WAC 110-148-1365.

33.     Of utmost importance, applicants "must demonstrate they have the ability to furnish children with a nurturing, respectful, and supportive environment." WAC 110-148-1365.

34.     There is nothing under Washington law that authorizes the Department to impose any additional licensing requirements not set forth in the applicable regulations.

**Licensed Foster Parents' Duty Towards Children In Their Care**

35.     After a home has been licensed, the Department then identifies the "maximum number, age range, and gender of the children that may be placed" in the foster home, based on the foster parent's "skills, the number of care providers,

COMPLAINT FOR DECLARATORY AND          Page 8
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

the physical accommodations of [the] home and the needs of the children placed in [the] home." WAC 110-148-1385.

36.     For children placed by the Department, foster parents must "make all reasonable efforts to ensure that children are not abused or neglected." WAC 110-148-1520.  Foster parents "must provide and arrange for care that is appropriate for the child's age and development including: (a) Emotional support; (b) Nurturing and affection; (c) Structured daily routines and living experiences; and (d) Activities that promote the development of each child.  This includes cultural and educational activities in your home and the community."  WAC 110-148-1520.

37.     The Department also specifies that foster parents "must follow all state and federal laws regarding nondiscrimination while providing services to children in your care. You must treat foster children in your care with dignity and respect regardless of race, ethnicity, culture, sexual orientation and gender identity." WAC 110-148-1520(6).

38.     Foster parents similarly "must connect a child with resources that meets a child's needs regarding race, religion, culture, sexual orientation and gender identity. These include cultural, educational and spiritual activities in your home and community . . . ." WAC 110-148-1520(7). The child's social worker or case manager is tasked to assist "with identifying these resources." *Id*.

39.     Licensed foster parents also "must ensure that children receive appropriate medical and dental care." WAC 110-148-1550.

### The Department's Policy to Support LGBTQ+ Children and Youth

40.     In July 2018, the Department enacted Policy 6900, entitled "Supporting LGBTQ+ Identified Children and Youth."

41.     The Policy explicitly "applies to [Department] staff," and does not purport to apply to foster families.

42.     The Policy's stated purpose is "[t]o address the specific needs of children and youth under the age of 21 receiving Children's Administration (CA) services who are developing, discovering, or identifying themselves as lesbian, gay, bisexual, transgender and questioning (LGBTQ+)" and to "provide guidance to assist CA staff in identifying and referring LGBTQ+ children and youth to appropriate and culturally responsive services."

43.     Under the Policy, a caseworker must "[c]onsider the child or youth's LGBTQ+ identity as a factor when making placement decisions," including "[d]etermining, on a case-by-case basis, which placement option would be in the child or youth's best interest for their safety and well-being." (Emphasis added.)

44.     The Policy also mandates that a caseworker "[s]upport any youth identifying as transgender and seeking gender affirming medical services. This includes, but is not limited to: Following the advice of the medical and therapeutic

COMPLAINT FOR DECLARATORY AND     Page 10
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

professionals working with the youth. Standard medical protocols must be followed."

45.    The Policy further authorizes a caseworker to "[o]btain[] a court order or parent or legal guardian consent before providing consent for a youth to undergo gender affirming related medical care" such as "Hormone blockers," "Hormone Replacement Therapy (HRT)," or "Behavior Health Services (Gender Dysphoria)."

46.    There is nothing in Policy 6900 that applies to the Department's foster parent licensing requirements or that authorizes the Department to impose any of the Policy's caseworker mandates on prospective foster parents.

47.    There is nothing in Policy 6900 that imposes any separate foster parent licensing requirement with which applicants must comply.

## Foster Care in Washington

48.    As of June 2019, Washington had approximately 9,200 children and youth in out-of-home placements, with only about 5,110 available foster homes.

49.    Thus, a growing number of children are removed from their families only to enter a foster care system that cannot even place them in a home. Hundreds of these children spend countless nights in hotels, while others are sent out of state to group facilities with questionable practices.

COMPLAINT FOR DECLARATORY AND         Page 11
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

50.    In short, Washington has a foster care crisis caused by too many children in need of the State's care and protection and not enough qualified licensed foster homes in which to place them.

### The Department's Family Home Study Guide

51.    In January 2020, the same month the Hawks applied for a license, the Department revised its "Family Home Study Guide."  It also updated its related "Family Home Study Questions and Prompts," which identifies questions Foster Care Licensors can ask families in conducting a home study.

52.    Although the Department enacted Policy 6900 in 2018, the earlier versions of these guidance documents did not contain questions about foster children who identify, or may at some time in the future identify, as LGBTQ+.

53.    The updated versions state that Foster Care Licensors "may" consider questions such as "How would you support a child or youth who identifies as LGBTQ+?" or "How would you respond or react if your child, a child in your care or a family member identified as LGBTQ+?"

54.    The document specifically states that it is only "a guide to provide workers with a framework for interviews."  It does not mandate that specific questions be asked.  Nor does it suggest how a foster care applicant must respond in order to qualify for a license.

### The Hawks' Washington Foster Parent Application

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
CASE NO.

Page 12

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

55.    Before they left Nevada, the Hawks began to look for a possible teenager to adopt when they moved to Washington.

56.    The Hawks reached out to the Department, expressed their interest in becoming foster and adoptive parents.  Using resources then available through the Department, the Hawks began considering specific children who were waiting to be adopted. The Hawks identified and met one teenage boy in particular who they were interested in adopting.

57.    As part of this process, the Hawks worked with Alexander Goins, an Adoptions Social Service Specialist with the Department.

58.    In late January 2020, after they had moved to Washington, the Hawks worked with Mr. Goins to arrange another visit with the teenager who they were interested in adopting, this time at the Woodland Park Zoo in Seattle.  That visit took place in mid-February and lasted for several hours.

59.    Soon after that visit, the Hawks expressed their willingness to adopt this teenage boy, and asked Mr. Goins to provide background information about him.

60.    Also soon after that visit took place, Mr. Goins introduced the Hawks to Ashley Wambach, who served as a liaison between the Department and two organizations – Olive Crest and Fostering Together – that worked in partnership with the Department to guide people through the foster parent licensing process.

61.   Ms. Wambach provided the Hawks with information about the Washington foster parent license process and sent them a link where they could take online Caregiver Core Training and secure a certificate of completion.

62.   During the next few weeks, the Hawks completed these online classes, requested a coaching session as part of their Caregiver Core Training, and scheduled their fingerprint appointments.   They also submitted the required emergency plan as well as all other medical forms and certificates (*e.g.*, CPR/First Aid/BBP).

63.   In early March 2020, the Hawks arranged for another visit with the teenager they hoped to adopt.   They also spoke with Mr. Goins about the possibility of placing the teenager in their home after the completion of the school year as they moved towards finalizing his adoption.

64.   In late April, Mr. Goins arranged a meeting with the Hawks to discuss the teenager they wanted to adopt and what the Department was doing to achieve permanency for him.

65.   By May 2020, the Hawks had completed their foster parent application, secured the required background checks and submitted all of the required paperwork to the Department.

COMPLAINT FOR DECLARATORY AND        Page 14
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

66.    In mid-May, Mr. Goins told the Hawks that once their home study had been completed, the Department would be moving forward with placing the teenager in the Hawks' home.

### The Hawks' Home Study

67.    In February 2020, the Hawks inquired whether they could use their Nevada home study.  Mr. Goins told them that they could not, and that they would need to secure a new home study in order to secure a Washington foster parent license.

68.    The Department subsequently assigned Amanda Wilson, a Home Study Assessment Specialist, to conduct the Hawks' home study.

69.    In mid-May 2020, Ms. Wilson interviewed the Hawks via a Zoom meeting.

70.    During Ms. Wilson's interview of Vance and Kealy:

a.    Ms. Wilson was aware that both Vance and Kealy are faithful Evangelical Christians.

b.    Ms. Wilson asked a number of appropriate questions dealing directly with the Washington foster parent licensing requirements focusing on such things as the Hawks' family history, the manner in which Vance and Kealy were raising their own child, communication issues, home safety, and disciplinary issues.

COMPLAINT FOR DECLARATORY AND            Page 15
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

71.   In addition to these questions, Ms. Wilson also questioned both Vance and Kealy with regard to hypothetical issues related to a teenager with sexual orientation or gender identity issues.  These questions included such things as:

a.   How would the Hawks deal with a gay or lesbian child?

b.   If a teenager wanted to undergo hormone therapy to change his/ her sexual appearance, would the Hawks support that decision and transport the child for those treatments?

c.   If a teenager wanted to dress like a member of the opposite sex or be called by a name associated with the opposite sex, would the Hawks accept that decision and allow the child to act in that manner?

72.   Both Vance and Kealy cooperated throughout the interview and responded to all of the questions openly, honestly, and in a manner consistent with their religious beliefs.

73.   Vance and Kealy made clear to Ms. Wilson that it is important and part of their Christian obligation to love and support all. The Hawks made clear that they would provide a supporting and loving home for any child placed under their care regardless of how that child might identify.

COMPLAINT FOR DECLARATORY AND       Page 16
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

74.    With regard to the specific hypothetical questions posed during the home study, the Hawks stated that they would treat any child in their care in the same manner that they would treat their own child.

75.    Concerning the question about how they would address a transgender teen, the Hawks responded that they would not call the child by the child's preferred pronoun.  As for possible hormone therapy, the Hawks responded that although they could not support such treatments based on their sincerely-held religious convictions, they absolutely would be loving and supportive of the child.

76.    Two weeks after Ms. Wilson conducted the home study, Kealy reached out to her to inquire about when she would complete her evaluation.

77.    In a later telephone conversation, Ms. Wilson told Kealy that the Department was denying the Hawks' home study because they would not call a transgender child by the child's preferred pronoun and they would not support medical or surgical gender reassignment.

78.    Kealy asked for written confirmation that this was the reason for the Department's denial of the home study.  In response, Ms. Wilson did not confirm that this was the rationale for the Department's decision.  She did state, however, that although the Hawks could "reapply and go through the Home Study process again . . . our policies and laws dictate that your Home Study outcome will likely

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

be the same unless you and Vance are willing to take the time to learn more about LGBTQ+ youth and make some changes in your attitudes."

79.     On June 9, 2020, Ms. Wilson, on behalf of the Department, sent the Hawks a letter stating that the Department decided not to approve their home study.

80.     According to the denial letter, "[t]his decision is based on your inability to be supportive of LGBTQ youth and accepting of their values, beliefs and how they choose to present themselves.  You were also unwilling to accept new learning or training around this issue."

81.     The Department has never identified what standard the Hawks would be required to meet in affirming what they would do in any given future situation.  The standard instead is flexible.  According to the Department's "Family Home Study Questions and Prompts," "[c]oncerns about applicants do not automatically result in a denial of a foster care license, or even require additional training."

82.     Two weeks after that letter, Ashley Wambach contacted Kealy and suggested that she take a "LGBTQ+ class."  Ms. Wambach stated "[i]f you take this course and redo the full home study our Area Administrator . . . will relook at your home study.  . . .  [T]his is a good offer."

83.     The Hawks respectfully declined this offer.  The Hawks did not believe that they required further education in order to provide a safe, loving home

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

to any child placed in their care. Moreover, because the Department never expressed any willingness to accommodate their sincerely-held religious beliefs, the Hawks saw no need to attend a course designed to instruct them on policies they could not accept and remain true to their spiritual principles.

84. The Hawks remain committed to becoming licensed foster parents in Washington.

85. They have an honest and unwavering desire to help children in need and truly want the opportunity to provide a safe, stable and caring home for children, particularly for a teenager waiting to be adopted.

86. Vance and Kealy Hawk are willing to serve as foster or adoptive parents for children, and to love and encourage them regardless of their race, sex, religion, national origin, ancestry, age, disability, familial status, sexual orientation, or gender identity.

87. Upon information and belief, the Department's decision not to approve the Hawks' home study may have future adverse consequences if the Hawks move to another state and seek to adopt a child in that jurisdiction.

## COUNT I
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AMENDMENT
## TO THE U.S. CONSTITUTION
## FREE EXERCISE CLAUSE —INDIVIDUALIZED ASSESSMENT

COMPLAINT FOR DECLARATORY AND           Page 19
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

88.    Plaintiffs reallege and incorporate by reference all the foregoing paragraphs and all subparagraphs as if they were fully set forth herein.

89.    The Department's denial of the Hawks' home study places a substantial burden on their religious exercise by forcing them to choose between the opportunity to be considered as foster parents for children in need and potentially adoptive parents and maintaining their religious beliefs.

90.    The Department's ultimate decision to deny the Hawks' application was based on an individualized assessment of their religious beliefs and their religiously-motivated responses to Ms. Wilson's questions.

91.    When a law or policy gives the government discretion to make case-by-case decisions based on the unique circumstances of a particular situation, strict scrutiny is required.

92.    The Department lacks a compelling governmental interest in requiring the Hawks or other foster care applicants proactively to affirm how they will respond to a hypothetical situation that may or may not happen sometime in the future.

93.    To the extent the Department has a compelling governmental interest, there are other ways it could meet that interest that are less restrictive to religion.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

94.     Absent declaratory and injunctive relief, the Hawks have been, and will continue to be, irreparably harmed by the Department's actions.

**COUNT II**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT**
**TO THE U.S. CONSTITUTION**
**FREE EXERCISE CLAUSE —IMPOSING SPECIALIZED**
**DISABILITIES ON THE BASIS OF RELIGIOUS BELIEF**

95.     Plaintiffs reallege and incorporate by reference all the foregoing paragraphs and all subparagraphs as if they were fully set forth herein.

96.     The Hawks are qualified to be licensed as foster parents and were denied a license only because they stated they would support a hypothetical foster child who might identify as LGBTQ+ consistent with their religious beliefs.

97.     The Department denied the Hawks' application because, rather than accommodate the Hawk's sincerely-held religious beliefs, the Department insisted that they "accept new learning or training around this issue."

98.     Barring the Hawks, from providing any foster care services, based on their religious beliefs, violates their constitutional rights.

99.     The First Amendment excludes all governmental punishment of religious beliefs as such.

100.    The government cannot punish the expression of religious beliefs that it considers false or impose special disabilities on the basis of religious views or religious status.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

101. Such governmental punishment of religious beliefs is never permissible.

102. The Department's denial of the Hawks' foster care license based on their religious beliefs was per se unconstitutional under the Free Exercise Clause.

103. Absent declaratory and injunctive relief, the Hawks have been, and will continue to be, irreparably harmed by the Department's actions.

**COUNT III**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT**
**TO THE U.S. CONSTITUTION**
**FREE EXERCISE CLAUSE —NOT NEUTRAL**

104. Plaintiffs reallege and incorporate by reference all the foregoing paragraphs and all subparagraphs as if they were fully set forth herein.

105. Government action is not "neutral" if it "restrict[s] practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

106. "Facial neutrality is not determinative." *Lukumi*, 508 U.S. at 534. Rather the Free Exercise Clause also forbids "covert suppression" of religion and "subtle departures from neutrality." *Id*.

107. The Department excludes potential foster parents who will not "affirm" LGBTQ+ children in specific ways, even if such acquiescence violates

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

the foster parents' own sincerely-held religious beliefs and the foster parents are committed to providing a safe and loving home for any child in their care.

108.   The denial of their application for a foster care license places via non-neutral proceedings imposed a substantial burden on their religious exercise by forcing them to choose between the opportunity to be considered as foster parents, and maintaining their religious beliefs.

109.   The policy imposed a substantial burden on the Hawks' religious exercise by forcing them to choose between the opportunity to be considered as foster parents and maintaining their religious beliefs.

110.   The Hawks are entitled to be evaluated as foster parents via a process that is not biased against their religious beliefs.

111.   At minimum, a government policy that is not neutral triggers strict scrutiny.

112.   The Department lacks a compelling governmental interest in requiring the Hawks or other foster care applicants proactively to affirm how they will respond to hypothetical situations that may or may not happen sometime in the future, such as the ones raised here.

113.   To the extent the Department has a compelling governmental interest, there are other ways it could meet that interest that are less restrictive to religion.

COMPLAINT FOR DECLARATORY AND          Page 23
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

114.   Absent declaratory and injunctive relief, the Hawks have been, and will continue to be, irreparably harmed by the Department's actions.

**COUNT IV**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT**
**TO THE U.S. CONSTITUTION**
**FREE SPEECH—COMPELLED SPEECH**

115.   Plaintiffs reallege and incorporate by reference all the foregoing paragraphs and all subparagraphs as if they were fully set forth herein.

116.   The Government cannot compel a party "to be an instrument for fostering public adherence to an ideological point of view." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

117.   Government regulations that "target speech based on its communicative content . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.

118.   "[F]reedom of speech includes both the right to speak freely and the right to refrain from speaking at all. . . . Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command" and should be "universally condemned." *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
CASE NO.

Page 24

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

119.   Requiring foster parents to affirm as an ideological matter the state's views on sexual orientation and gender identity, regardless of whether those views will ever be implicated in providing foster care for any particular child is a requirement of speech, not conduct.

120.   By requiring the Hawks, as a condition for getting a license, to affirm what they would do in a hypothetical situation that might never arise, the state is compelling speech to foster adherence to the government's preferred point of view.

121.   The Department does not have a compelling interest in forcing the Hawks to affirm that they will speak in certain ways regarding hypothetical issues that may or may not ever arise.

122.   To the extent the Department alleges a compelling interest, there are other ways to meet that interest that are less restrictive of religion.

123.   Absent declaratory and injunctive relief, the Hawks have been, and will continue to be, irreparably harmed by the Department's actions.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

1
2
3
4

**COUNT V**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT**
**TO THE U.S. CONSTITUTION**
**FREE EXERCISE—HYBRID RIGHTS**

5
6
7

124.   Plaintiffs reallege and incorporate by reference all the foregoing paragraphs and all subparagraphs as if they were fully set forth herein.

8
9
10
11

125.   Government restrictions that burden religion are subject to strict scrutiny when the restrictions simultaneously burden other constitutional rights. *Employment Div. v. Smith*, 494 U.S. 872, 881 (1990).

12
13
14
15

126.   The state's policy impinges not only on the Hawks' freedom of religion, but also on their right to freedom of speech without having to accept the government's viewpoints on child rearing.

16
17

127.   Because the government regulations at issue infringe multiple constitutional rights, strict scrutiny applies.

18
19
20
21
22
23

128.   The Department lacks a compelling governmental interest in requiring the Hawks or other foster care applicants proactively to affirm how they will respond to a hypothetical situation that may or may not happen sometime in the future.

24
25
26
27

129.   To the extent the Department has a compelling governmental interest, there are other ways it could meet that interest that are less restrictive to religion.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
CASE NO.

Page 26

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

130.   Absent declaratory and injunctive relief, the Hawks have been, and will continue to be, irreparably harmed by the Department's actions.

**COUNT VI**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT**
**TO THE U.S. CONSTITUTION**
**UNCONSTITUTIONAL CONDITIONS**

131.   Plaintiffs reallege and incorporate by reference all the foregoing paragraphs and all subparagraphs as if they were fully set forth herein.

132.   In the same way that the Department generally cannot directly compel speech or impinge the free exercise of religion, it cannot do so indirectly through conditioning a government benefit (here a license to serve as a foster parent).  *Agency for Int'l Dev. v. AOSI*, 570 U.S. 205, 214 (2013).

133.   The Hawks' ability to apply to the government for a license that would allow them to be foster parents and potentially adopt a child is a valuable benefit.

134.   That benefit cannot be conditioned on the Hawks' forsaking their constitutional rights.

135.   The Department has conditioned the issuance of a license on the Hawks' agreement to abandon rights under the First Amendments.

136.   For all the reasons above, the Department cannot condition a government benefit on unconstitutional actions without satisfying strict scrutiny.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

**PRAYER FOR RELIEF**

Plaintiffs Vance and Kealy Hawk request that the Court enter a judgment in their favor and against Defendant Hunter, Secretary of Washington State Department of Children, Youth and Families for the following:

1.      Declaratory relief that the denial of the Hawks' application to become licensed foster parents by Defendant and the Department based on the Hawks' sincerely-held religious beliefs is unconstitutional;

2.      Injunctive relief, requiring Defendant and the Department he oversees to grant the Hawks' foster parent application;

3.      Injunctive relief, enjoining Defendant and the Department he oversees from enforcing or threatening to enforce Policy 6900 or any other Department policy, regulation or practice with regard to the Department's consideration of an application to become licensed foster parents in a manner that conflicts with the applicant's sincerely-held religious beliefs concerning sexual orientation or gender identity;

4.      Reasonable attorneys' fees and costs of suit under 42 U.S.C. § 1988 or such other authority as may authorize such an action; and

5.      Such other and further relief as the Court deems just and proper.

COMPLAINT FOR DECLARATORY AND          Page 28
INJUNCTIVE RELIEF
CASE NO.

Ellis | Li | McKinstry
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101-1820
206.682.0565  Fax: 206.625.1052

1    DATED this September 4, 2020

2                                    ELLIS, LI & McKINSTRY PLLC

3
                                     By:   s/Keith A. Kemper
4                                          _____
                                           Keith A. Kemper, WSBA No. 19438
5                                          Abigail St. Hilaire, WSBA No. 48194
                                           1700 Seventh Avenue, Suite 1810
6                                          Seattle, WA 98101-1820
                                           Telephone: (206) 682-0565
7                                          Fax: (206) 625-1052
                                           Email: kkemper@elmlaw.com
8                                                  asthilaire@elmlaw.com
9                                          *Attorneys for Vance and Kealy Hawk*

10

11                                   GENERAL CONFERENCE OF SEVETH-
                                     DAY ADVENTISTS
12
                                     By:   s/Todd R. McFarland
13                                         _____
14                                         Todd R. McFarland, IL Bar # 6272690
                                           12501 Old Columbia Pike
15                                         Silver Spring, MD 20904
                                           Telephone: (301) 680-6321
16                                         Fax: (301) 680-6329
17                                         Email: mcfarlandt@gc.adventists.org
                                           *Attorneys for Vance and Kealy Hawk*
18                                         *Admission Pro Hac Vice Pending*

19                                   RODEY DICKASON SLOAN AKIN &
                                     ROBB, P.A.
20

21                                   By:   s/Andrew G. Schultz
                                           _____
22                                         Andrew G. Schultz, NM Bar # 3090
                                           201 3rd St., Suite 2200
23                                         Albuquerque, NM 87102
                                           Telephone: (505) 765-5900
24                                         Fax: (505) 768-7395
25                                         Email: aschultz@rodey.com
                                           *Attorneys for Vance and Kealy Hawk*
26                                         *Admission Pro Hac Vice Pending*

27

COMPLAINT FOR DECLARATORY AND        Page 29        Ellis | Li | McKinstry
INJUNCTIVE RELIEF                                   1700 Seventh Avenue, Suite 1810
CASE NO.                                            Seattle, WA 98101-1820
                                                    206.682.0565  Fax: 206.625.1052